# EXHIBIT "4"

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA

v.

ALFREDO HAWIT,
ARIEL ALVARADO ,
RAFAEL CALLEJAS,
BRAYAN JIMÉNEZ ,
EDUARDO LI,
JULIO ROCHA,
RAFAEL SALGUERO,
COSTAS TAKKAS,
HÉCTOR TRUJILLO,
REYNALDO VASQUEZ,
JACK WARNER,
JUAN ÁNGEL NAPOUT,                    No. 15-cr-252 (RJD) (RML)
MANUEL BURGA,
CARLOS CHÁVEZ,
LUÍS CHIRIBOGA,
MARCO POLO DEL NERO,
EDUARDO DELUCA,
RAFAEL ESQUIVEL,
EUGENIO FIGUEREDO,
NICOLÁS LEOZ,
JOSÉ MARIA MARIN,
JOSÉ LUÍS MEISZNER,
ROMER OSUNA,
RICARDO TEIXEIRA,
AARON DAVIDSON,
HUGO JINKIS, and
MARIANO JINKIS,

              Defendants.

UNITED STATES OF AMERICA

v.

JEFFREY WEBB,                         No. 15-cr-252 (RJD) (RML)
ALEJANDRO BURZACO, and
JOSÉ MARGULIES,
              (also known as José Lazaro),

              Defendants.

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>CHARLES BLAZER,<br><br>       Defendant. | No. 13-cr-602 (RJD) (RML) |
| UNITED STATES OF AMERICA<br><br>v.<br><br>JOSÉ HAWILLA,<br>TRAFFIC SPORTS USA, INC., and<br>TRAFFIC SPORTS INTERNATIONAL, INC.,<br><br>       Defendants. | No. 14-cr-609 (RJD) (RML) |
| UNITED STATES OF AMERICA<br><br>v.<br><br>LUIS BEDOYA,<br><br>       Defendant. | No. 15-cr-569 (RJD) (RML) |
| UNITED STATES OF AMERICA<br><br>v.<br><br>ZORANA DANIS,<br><br>       Defendant. | No. 15-cr-240 (RJD) (RML) |
| UNITED STATES OF AMERICA<br><br>v.<br><br>ROGER HUGUET,<br><br>       Defendant. | No. 15-cr-585 (RJD) (RML) |
| UNITED STATES OF AMERICA<br><br>v.<br><br>SERGIO JADUE,<br><br>       Defendant. | No. 15-cr-570 (RJD) (RML) |

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>FABIO TORDIN,<br><br>Defendant. | No. 15-cr-564 (RJD) (RML) |
| UNITED STATES OF AMERICA<br><br>v.<br><br>DARYAN WARNER,<br>DARYLL WARNER,<br><br>Defendants. | No. 13-cr-402 (WFK) |
| UNITED STATES OF AMERICA<br><br>v.<br><br>DARYAN WARNER,<br>DARYLL WARNER,<br><br>Defendants. | No. 13-cr-584 (WFK) |

## FÉDÉRATION INTERNATIONALE DE FOOTBALL ASSOCIATION'S
## VICTIM STATEMENT AND REQUEST FOR RESTITUTION

The Fédération Internationale de Football Association ("FIFA") respectfully files this Victim Statement and Request for Restitution.  As discussed below, the Defendants in the above-captioned proceedings held positions of trust within FIFA and other national or international football organizations, or were sports marketing companies and executives with whom FIFA's member associations and confederations did business.  Over many years, the Defendants grossly abused their positions of trust to enrich themselves, while causing significant direct and proximate harm to FIFA.[1]  The harm includes large financial losses (including but not limited to

---

[1]   The allegations against the Defendants in this Victim Statement and Request for Restitution are based upon the Indictment filed in *United States v. Webb et al.*, 15-cr-252 (E.D.N.Y. May 20, 2015), Dkt. No. 1, the Superseding Indictment filed in that case, now styled *United States v.*

3

losses for salaries and/or benefits paid to the Defendants, and for funds that were diverted from their intended uses to Defendants' pockets), as well as damage to FIFA's reputation, intellectual property, and business relationships.  The damage done by the Defendants' greed cannot be overstated.  Their actions have deeply tarnished the FIFA brand and impaired FIFA's ability to use its resources for positive actions throughout the world, and to meet its global mission of supporting and enhancing the game of football, commonly known in the United States as soccer. While the investigation continues, the loss amounts are believed to be at least in the tens of millions of dollars.  As a victim of the Defendants' crimes, FIFA is entitled to recover restitution under the Mandatory Restitution to Victims Act, 18 U.S.C. § 3663A *et seq.*[2]  To date the government has ensured the forfeiture of more than $190 million in assets and identified, recovered, or frozen more than $100 million in the United States and abroad relating to the Defendants' felonious schemes.[3]  These funds should be used to compensate the victims of the Defendants' crimes, particularly FIFA and its member associations and confederations.

## I.   FIFA IS A COMPLEX INTERNATIONAL ASSOCIATION THAT HAS BEEN A GLOBAL FORCE FOR GOOD.

The brazen corruption of the Defendants has co-opted the FIFA brand and obscured its role as a positive global organization.  To appreciate the importance of restitution in this matter, it is important to understand the history and international reach of FIFA.

---

*Hawit, et al.*, 15-cr-252 (E.D.N.Y. Nov. 25, 2015), Dkt. No. 102, related investigations by the FIFA Ethics Committee, and public media.  Investigation into the allegations continues, and the allegations will be supplemented as appropriate at the time of sentencing.

[2]   Funds seized from and forfeited in these actions should be used first to compensate victims, either as restitution under the Mandatory Restitution Act or through remission or restoration under 28 C.F.R. Part 9.

[3]   *See* Press Release, U.S. Dep't of Justice, *Sixteen Additional FIFA Officials Indicted For Racketeering Conspiracy And Corruption* (Dec. 3, 2015), *available at* https://www.justice.gov/usao-edny/pr/sixteen-additional-fifa-officials-indicted-racketeering-conspiracy-and-corruption.

## A. FIFA is a Unique Organization that Reflects the Rich Diversities that Exist Throughout the World.

Founded in 1904, FIFA is organized under Swiss association law. It currently has 209 member associations from throughout the world, giving it greater global reach and diversity than even the United Nations. Each FIFA member association represents the football federation of a particular nation or territory. Together the member associations make up the FIFA Congress, FIFA's supreme legislative body, which elects the FIFA President and enacts FIFA statutes. Every member association has just one vote. Thus, while the FIFA Congress reflects all of the cultural, geographic, and economic diversity present in the world, the members come together as equals. It is also a critical feature of FIFA's status as an association under Swiss law that each member association remains a separate organization that retains its integrity and autonomy over its own business affairs and governance. On the basis of applicable Swiss association law, FIFA's direct power over each of the member associations is limited. Under the FIFA statutes and regulations, it is the Congress that is given wide discretion over the powers FIFA is granted over its member associations. In other words, the member associations that make up the FIFA Congress have significant control over what powers they cede to FIFA.

Each FIFA member association also is a member of one of the six continental confederations, which include the Confederation of North, Central American and Caribbean Association Football ("CONCACAF"), the Confederación Sudamericana de Fútbol ("CONMEBOL," the South American confederation), the Union des Associations Européennes de Football ("UEFA," the European confederation), the Confédération Africaine de Football ("CAF," the African confederation), the Asian Football Confederation ("AFC"), and the Oceania Football Confederation ("OFC"). The confederations are separate from FIFA, but membership in a confederation is a prerequisite for any national football federation to become a FIFA

5

member association, and the confederations (not FIFA itself) select the individuals who serve on the FIFA Executive Committee. The FIFA President also serves on and chairs the Executive Committee.

The twenty-four member Executive Committee has historically been a powerful force in FIFA, guiding its strategy and deciding key issues. Until 2011 (when the power was shifted to the Congress), the Executive Committee decided where the FIFA World Cup™ would be played. On February 26, 2016, an extraordinary session of the FIFA Congress met and elected a new President and passed key reforms. Among the reforms are changes in the composition and role of the Executive Committee. It will increase in size from twenty-four to as many as thirty-seven members, will have more women members, and will turn over a number of day-to-day management decisions to FIFA administrative bodies. Nevertheless, the Executive Committee— to be renamed the "FIFA Council"—will retain a key role in strategic and important supervisory decisions. Similarly, many of the operational roles of the FIFA President will devolve to the Secretary General.

### B. FIFA Bridges World Differences Through Reinvesting its Resources and Promoting the Game of Football Everywhere.

FIFA is a not-for-profit organization that exists "to improve the game of football constantly and promote it globally in the light of its unifying, educational, cultural and humanitarian values, particularly through youth and development programmes." Everything FIFA does—including the many international tournaments it organizes, the youth development programs it supports, and all of its marketing efforts—is designed to promote football throughout the world. By doing so, it has been a tremendous force for good across far reaches of the globe.

FIFA seeks to unite and inspire football players and fans throughout the world by organizing international competitions. Largest among these tournaments is the FIFA World

6

Cup™, the biggest single-sport competition worldwide and the most watched sporting event in the world.  But FIFA and its members recognize that football is more than just a game.  It has positive transformative powers, both through its ability to bring people together for a positive purpose and through the re-investment of financial proceeds generated by its commercial success.  For example, few could dispute the phenomenal reach of the recent 2015 FIFA Women's World Cup™ in Canada.  More than 750 million television viewers watched the matches, across nearly every time zone on the planet.  Broadcasters showed an astonishing 7,781 hours of coverage of the various matches.  New attendance records had 1,353,506 people going to the games, and thousands of volunteers from over 100 countries supported the efforts.  The U.S.-Japan final was the most watched football game (men or women) in U.S. history.

But none of this happened by accident.  FIFA provides the stable and sustainable financial foundation that football needs to develop and prosper as a highly popular international sport.  Indeed, football has flourished as the world's most popular and celebrated sport largely because of FIFA's tireless efforts to promote it.  With more than $550,000 *per day* going toward football development projects throughout its 209 member associations,[4] FIFA is the driving force behind football throughout the world, ensuring that it is on solid ground everywhere.

FIFA recognizes that not all members have access to the same resources, and many exist in troubled parts of the world.  FIFA has therefore focused logistical and financial support on those member associations in impoverished regions.  For example, through its Football For Hope initiative, FIFA helped UNICEF procure jerseys and other gear for countries that use football to foster peace after periods of conflict. More than a game, football can help restore a sense of normality among children affected by protracted violence.   FIFA also supports existing

---

[4]   FIFA provides annual funding of $250,000 to each member association and $5.5 million to each of the continental confederations to be used for the benefit of all members in a region.

psychological programs for children that teach tolerance and non-violence in schools, communities, and society more broadly.  100,000 children took part in these projects, which were run in close cooperation with ministries of education, schools, local NGOs, and international aid organizations.

Moreover, in many areas of the globe, there is limited support for any opportunities for girls and women, let alone support for girls' and women's sports.  Just like Title IX changed the reality for women in sports in the United States, FIFA purposely changed the reality for girls and women in football around the globe by consistently dedicating resources to girls' and women's programs.  The success in Canada proved the value of these programs.  While there is much left to be done, the progress should not be diminished. Girls throughout the world now can dream that they too can play in a FIFA World Cup[TM].

## II.   THE DEFENDANTS EXPLOITED THEIR FIFA POSITIONS TO ENRICH THEMSELVES, TO THE DETRIMENT OF FIFA, ITS MEMBERS, AND FANS AROUND THE WORLD.

The success of FIFA's tireless efforts to promote international football has translated into significant commercial success.  The commercial benefits extended beyond FIFA to the member associations and confederations, which also have reaped record amounts in commercial partnerships.  As its commercial revenues grew, FIFA consistently sought to improve its accountability systems.  It built more robust financial accountability platforms, created a strong audit and compliance process, and created an independent Ethics Committee that wields both investigatory and punitive powers.

However, each individual member association of FIFA is a separate legal entity over which FIFA has limited legal controls, as the member associations are members, rather than affiliates, of FIFA.  While FIFA has increased accountability over the years, the 209 members have varying degrees of sound governance, resources, and internal accountability.  In addition,

the continental confederations are also separate legal entities and are neither affiliates nor members of FIFA.

The Defendants sought to exploit this structure as they ascended to powerful roles in various member associations, continental confederations, and FIFA. They looked for ways to line their own pockets and siphon off opportunities. They did violence to FIFA's principles, goals, and objectives as they promoted their own self-interests and sought to enrich themselves at FIFA's and football's expense. They sold the power of their positions, including by taking bribes and kickbacks in return for selling the valuable marketing rights associated with football tournaments and competitions. Together, the Defendants misappropriated FIFA's resources, its brand, and its commercial value to enlarge their own bank accounts. Their schemes were simplistic, but many in nature. In essence, they betrayed their duties and sold their powers to the highest bidder. Multiple indictments have now been returned that demonstrate varying schemes. Each one of them harmed FIFA, its member associations, the continental confederations, and the game of football.

### A. Defendants' Warner and Blazer's $10 Million 2010 FIFA World Cup[TM] Vote Scheme.

As stated, until 2011, the location of the FIFA World Cup[TM] was determined by a vote of the FIFA Executive Committee. Hosting a FIFA World Cup[TM] is a coveted event. It provides great prestige, economic benefits, and improvements in local and sporting infrastructure, with hundreds of millions of dollars flowing into a host country. The bid process to host a FIFA World Cup[TM] has been highly competitive. Every member of the FIFA Executive Committee is bound by the rules and process requiring an objective analysis of bids. In addition, every FIFA Executive Committee member is bound by a duty of loyalty to FIFA. Arguably, no Executive

Committee action is more important than how they discharge their duties relating to the premier FIFA event, the FIFA World Cup™.

It is now apparent that multiple members of FIFA's Executive Committee abused their positions and sold their votes on multiple occasions. As the Grand Jury alleged in the Superseding Indictment in *United States v. Hawit*, 15-cr-252 (E.D.N.Y. Nov. 25, 2015), Dkt. No. 102, Defendant Jack Warner, together with his co-conspirators Charles Blazer (who has admitted his crimes and pleaded guilty), Defendant Warner's son Daryan Warner, and other co-conspirators not named in the Superseding Indictment, engineered a $10 million payoff in exchange for Executive Committee votes regarding where the 2010 FIFA World Cup™ would be hosted. The scheme built off Defendant Warner's corrupt vote in 1992 for Morocco to host the 1998 FIFA World Cup™, when he accepted a bribe from the Moroccan bid committee in exchange for his vote for Morocco. Twelve years later, the Morocco bid committee once again offered Defendant Warner and Charles Blazer (who now also had a vote as an Executive Committee member) a bribe, this time of $1 million.

But Defendant Warner and his family had already established close ties to South Africa during South Africa's failed bid to host the 2006 FIFA World Cup™. For example, Daryan Warner had organized a series of friendly matches among CONCACAF teams to be played in South Africa, relying on his father's network of contacts there. Daryan Warner had also served as his father's bagman, traveling to a hotel in Paris, France to receive a briefcase with $10,000 in cash from a high-ranking South African bid committee official and immediately returning to Trinidad and Tobago to give it to Defendant Warner.

Ultimately, given Defendant Warner's strong illicit ties to the South African bid committee, the South Africans offered a more attractive bribe of $10 million in exchange for

Warner's, Blazer's, and a third Executive Committee member's votes. Warner and his co-conspirators lied to FIFA about the nature of the payment, disguising it as support for the benefit of the "African Diaspora" in the Caribbean region, when in reality it was a bribe. They disguised and funneled the bribe money through the financial accounts of FIFA, member associations, and the 2010 FIFA World Cup$^{TM}$ local organizing committee.  At the time of the scheme, Warner was a member of the FIFA Executive Committee, a FIFA vice president, and the president of both CONCACAF and the Caribbean Football Union ("CFU"), which had 31 member associations in its ranks.  Blazer was also a member of FIFA's Executive Committee, at times a member of FIFA's marketing and television committees, and the general secretary of CONCACAF.  They breached the fundamental duties they owed to FIFA, CFU, and CONCACAF and stole $10 million.

### B.  Warner's 2011 FIFA Presidential Election Scheme.

Having learned just how lucrative his votes could be, Defendant Warner decided to again flout his duties to FIFA and sold his vote in the 2011 FIFA presidential election, when fellow Executive Committee member Mohamed Bin Hammam decided to stand for president.  At the time, Bin Hammam was president of the Asian Football Confederation, which serves football in relation to a third of the world's population.  Because the FIFA President is elected by the FIFA Congress, Warner agreed not just to sell his own vote, but also to improperly use his positions of trust to amass votes from other CFU members.  Specifically, in exchange for bribes, Warner convened a special meeting of all of CFU's member associations in Trinidad and Tobago, so that Bin Hammam could gain the support of the officials in attendance.  Shortly before the vote, $363,537.98 was wired from a Bin Hammam account to an account in CFU's name and under Defendant Warner's control.

Then, after Bin Hammam addressed the conference, each attendee was directed to a room where they were handed an envelope and instructed not to discuss the envelope or its contents with anyone. The envelopes each had $40,000 in cash inside. Defendant Warner explained that although these funds had been disguised as payments from CFU, they were in fact payments from Bin Hammam. Defendant Warner further explained that the payments were bribes to gain these officials' support for Bin Hammam's presidential campaign.

Contrary to Warner's instructions, however, some recipients of the bribe payments did not remain silent. When Warner learned that the secret was out, he angrily denounced any efforts to thwart the brazen bribery scheme, stating "There are some people here who think they are more pious than thou. If you're pious, open a church, friends. Our business is our business."

The public revelation of the scheme and the resulting investigations by, among others, the FIFA Ethics Committee put overwhelming pressure on Warner to resign from his football-related posts, which he did in June 2011. After a searching investigation, FIFA issued life-time bans to both Warner and Bin Hammam. Yet even after Warner's resignation, Bin Hammam sent him at least one more payment, of $1,211,980 on July 14, 2011.

### C. Multiple Schemes to Sell Media Rights for FIFA World Cup™ Qualifiers.

Defendants from the CONCACAF confederation and from sports marketing companies engaged in a number of schemes to siphon off funds generated by the most valuable local football matches. The marketing rights to football matches can be extremely valuable, with tournaments such as the FIFA World Cup™ generating billions of dollars. Likewise, individual regional matches that determine which teams will participate in the FIFA World Cup™, known as World Cup qualifiers (which are staged by the respective continental confederations), also generate a great deal of interest and, as a result, valuable marketing rights. The Defendants made

12

sure they would benefit personally from these rights and diverted millions of dollars that should have been used to benefit the member associations and the game of football.

      **1.**      **Defendants Warner and Webb Corrupted the CFU FIFA World Cup™ Qualifiers.**

     Typically, the media rights to FIFA World Cup™ qualifiers are owned by the home team for each qualifier match.  However, CFU member nations tried to leverage the individual rights by pooling their "home team" rights and selling them to sports marketing companies prior to the announcement of matchups for the next FIFA World Cup™ qualifiers.  As President of CFU from 1998 until May 2011, Defendant Warner was responsible for negotiating the sale of the CFU media rights with sports marketing companies, including the Traffic Group.  His duty was to maximize the rights for the benefit of all CFU members.  Instead, apparently not satisfied with the millions he made in selling his Executive Committee votes, he diverted millions for his own benefit through side deals with Defendant Traffic USA, the U.S.-based subsidiary of the Traffic Group.  Warner and Defendant José Hawilla, the founder and owner of the Traffic Group, who together with Defendants Traffic USA and Traffic International has admitted the crimes and pleaded guilty, kept these side agreements a secret from FIFA and from the CFU member associations.

     Unfortunately, Defendant Warner's resignation in 2011 did not put a stop to the corruption around CFU's FIFA World Cup™ qualifiers.  When it came time to negotiate the rights to the qualifiers for the 2018 and 2022 editions of the FIFA World Cup™, Defendants Jeffrey Webb and Costas Takkas picked up where Defendant Warner left off.  With Warner's departure, Webb, then the president of the Cayman Islands Football Association and a high-ranking CFU official, negotiated the agreement with Defendant Traffic USA on behalf of CFU.  During the negotiations, Defendant Takkas, a close associate of Webb and the former general

secretary of the Cayman Islands Football Association, informed Traffic representatives that Webb wanted a $3 million bribe in exchange for conveying CFU's marketing rights to Traffic.

Traffic not only agreed to the bribes, but through a partnership with another sports marketing company called Media World (run by Defendants Fabio Tordin and Roger Huguet), Traffic was able to split the cost of the bribes. Money passed through various accounts, including through an intermediary that was a business associate of Defendant José Hawilla. Webb's cut found its way to bank accounts in Georgia to enable Webb to purchase a small mansion and install a swimming pool.

## 2.    Other Officials Corrupted UNCAF FIFA World Cup™ Qualifiers.

Other officials within the CONCACAF federation—specifically, those in Central America—corruptly profited from marketing rights too. However, unlike the CFU member associations, members of the Unión Centroamericana de Fútbol ("UNCAF," the Central American Football Union) did not pool their rights and instead negotiated individually. Among other things, this enabled more football officials, including the FIFA officials below, to profit from the prestige of the FIFA World Cup™ by skimming money and negotiating kickbacks. Just as they did for the rights to CFU's FIFA World Cup™ qualifiers, executives at Traffic and Media World paid bribes to these officials to secure the marketing rights to the matches. In total, the Defendants and their co-conspirators corrupted the negotiations for 15 different sets of FIFA World Cup™ qualifiers and pocketed large sums. Many did so in direct contravention of the duties they owed FIFA. Instead of providing honest services, they leveraged their positions of trust to divert money for their own use.

The sports marketing companies were able to pay and the CONCACAF officials were able to receive these bribes because the qualifiers were valuable; and the qualifiers were valuable due to FIFA's successful efforts to make the FIFA World Cup™ one of the most celebrated

14

sporting events in the world.  When the Defendants paid bribes and diverted money from the local and regional federations to their own pockets, they not only stole money from the member associations and the confederations, they did so using the goodwill and good name of FIFA and greatly tarnished the brand of the FIFA World Cup™.  These corrupt officials and executives include:

- Defendant Eduardo Li, who at the time was president of the Costa Rican football federation, a member of the FIFA Executive Committee, and a member of the FIFA Players' Status Committee.  He negotiated and obtained hundreds of thousands of dollars from Traffic and Media World in exchange for his agreement to sell them Costa Rica's marketing rights.

- Defendant Julio Rocha, both when he was president of the Nicaraguan football federation and later after he stepped down and became a FIFA development officer.  He negotiated and obtained thousands of dollars from Traffic in exchange for exercising his power to award contracts to Traffic.

- Defendants Alfredo Hawit and Rafael Callejas, senior leaders of the Honduran football federation and members of FIFA committees including the Executive Committee and the Marketing and Television Committee.  They obtained hundreds of thousands of dollars in bribe payments from Media World in exchange for the Honduran federation's agreement to sell its marketing rights to Media World.

- Defendant Reynaldo Vasquez, the president of the Salvadoran football federation.  He received tens of thousands of dollars from Media World in exchange for the Salvadoran federation's rights.

- Defendants Brayan Jiménez, Héctor Trujillo, and Rafael Salguero, at that time high-ranking or former high-ranking officials of the Guatemalan football federation.  They solicited and obtained bribes from Media World in exchange for Guatemala's marketing rights.  At the time, Salguero was a member of the FIFA Executive Committee and the FIFA Legal Committee, and Jiménez was a member of the FIFA Committee for Fair Play and Social Responsibility.

- And Defendant Ariel Alvarado, president of the Panamanian football federation and member of the FIFA Disciplinary Committee.  He obtained tens of thousands of dollars in bribes from Traffic.

### 3.    Other Schemes

The Grand Jury in *United States v. Hawit* found that the Defendants carried out numerous other bribery and kickback schemes to obtain illicit profits from football.  These schemes, and

the conduct of the sports marketing companies and Defendants Juan Ángel Napout, Manuel Burga, Marco Polo Del Nero, Eugenio Figueredo, José Maria Marin, Romer Osuna, Ricardo Teixeira, Luis Bedoya, and Sergio Jadue—all of whom held positions as FIFA officials—harmed FIFA in many ways.  As the Grand Jury laid out in detail in the Superseding Indictment, these Defendants solicited and accepted bribes in exchange for (1) terminating a sponsorship contract for the FIFA World Cup™ champion and awarding it to a rival company willing to pay bribes; (2) awarding marketing rights to tournaments that subsequently received FIFA's official sanction and imprimatur; and (3) agreeing to participate in international friendly matches at which the FIFA brand was on full display.  As described further below, through this conduct these Defendants flouted their duties to FIFA to exercise their official football power honestly and in good faith and not to tarnish FIFA's good name.

## III.    THE DEFENDANTS' CONDUCT HARMED FIFA.

As stated above, the damage the Defendants caused to FIFA, its member associations, and the game of football cannot be overstated.  Indeed, U.S. Attorney General Loretta Lynch recognized that FIFA itself suffered harm at the hands of the Defendants when she publically noted that "this corruption essentially hurts . . . the organization [*i.e.*, FIFA] itself."  Another Justice Department official added that "certainly FIFA," among others, "are victims in the case . . . .  If there comes a point in time that victims such as those . . . can come before the court and apply for restitution, we're certainly hopeful that those types of true victims . . . can get some of these forfeitures money that have been collected."  Press Conference, Attorney General Lynch on FIFA Arrests, U.S. Dep't of Justice (Dec. 3, 2015), *available at* http://www.c-span.org/video/?401555-1/attorney-general-loretta-lynch-fifa-arrests&start=2835.

16

## A. The Defendants' Conduct Damaged FIFA's Reputation.

As described above, FIFA has spent decades and millions of dollars building the brand of international football.  It promotes and funds countless programs and initiatives that support international football and beneficial causes throughout the world.  Yet today, FIFA has become notable for the Defendants' bribery and corruption, not its many good works.  The Defendants are responsible for harming FIFA's brand and bringing FIFA and the game itself into disrepute.  Indeed, the Grand Jury in *United States v. Hawit* specifically found that "the schemes deprived FIFA, the confederations, and their constituent organizations of their right to the honest and loyal services of the football officials involved.  Over time, and in the aggregate, such deprivations inflicted significant reputational harm on the victimized institutions . . . ."  Superseding Indictment ¶ 97, *United States v. Hawit*, 15-cr-252 (E.D.N.Y. Nov. 20, 2015), Dkt. No. 102.  FIFA is entitled to restitution for this harm to its business relationships, reputation and intangible property.  *See United States v. Milstein*, 481 F.3d 132, 137 (2d Cir. 2007) (victims are entitled to restitution under 18 U.S.C. § 3663A(b)(1) for harm to intangible property); *United States v. Shengyang Zhou*, 717 F.3d 1139, 1155–56 (10th Cir. 2013) (affirming award of restitution for efforts to repair the victim's reputation where the defendant's crimes harmed the victim's intangible property, including its reputation and brand).  The amount appropriate for this damage to reputation is subject to further investigation and analysis, but on information and belief is thought to be at least in the tens of millions of dollars.

## B. The Defendants Obtained Salaries and Other Benefits From FIFA Under False Pretenses.

By depriving FIFA of their honest services, the Defendants unfairly obtained money from FIFA in the form of salaries, bonuses, benefits, and other compensation.  The Defendants were not entitled to those payments and benefits because they did not give FIFA the full value of their

17

honest services in return.  FIFA is entitled to restitution for those amounts.  *See, e.g.*, *United States v. Bahel*, 662 F.3d 610 (2d Cir. 2011) (affirming restitution order for part of convicted UN employee's salary because "[t]here is no question that a portion of an individual's salary can be subject to forfeiture where, as here, an employer pays for honest services but receives something less"); *see also United States v. Skowron*, 839 F. Supp. 2d 740, 745 (S.D.N.Y. 2012) (awarding an employer partial return of compensation paid to employee convicted of an insider trading scheme because the "offenses of conviction directly and proximately harmed [the employer] . . . . [The] crimes deprived [the employer] of the honest services of its employee, diverted valuable corporate time and energy in the defense of [the employee and the employer], and injured [the employer's] reputation."), *aff'd*, 529 F. App'x 71 (2d Cir. 2013).

As a result, FIFA is entitled to recover sums paid to or for the benefit of the Defendants including compensation, per diems, travel, and other costs.   Investigation and calculation continues, but on information and belief, the loss amounts are at least $28,224,687.

Specifically, for the following Defendants, the loss amounts since 2004 are at least:[5]

Luis Bedoya (pleaded guilty):  $517,843

Charles Blazer (pleaded guilty):  $5,374,148

Marco Polo Del Nero:  $1,673,171

Eugenio Figueredo:  $1,011,018

Alfredo Hawit:  $230,479

Nicolás Leoz:  $3,254,886

Eduardo Li:  $10,750

Juan Ángel Napout:  $339,693

Rafael Salguero:  $5,134,980

---

[5]   These figures are subject to further investigation and may be supplemented.

Ricardo Teixeira:  $3,514,025

Jack Warner:  $4,462,263

Jeffrey Webb (pleaded guilty):  $2,016,205

Further, for the following Defendants, the loss amounts since 2008 are at least:[6]

Ariel Alvarado:  $33,173

Manuel Burga:  $32,250

Rafael Callejas:  $68,336

Sergio Jadue (pleaded guilty):  $12,587

Brayan Jiménez:  $2,000

José Maria Marin:  $114,507

Romer Osuna:  $34,592

Julio Rocha:  $387,781

## C.  The Defendants Misappropriated Funds and Damaged FIFA.

As described above, Defendants Jack Warner, Charles Blazer, Daryan Warner, and their co-conspirators misappropriated at least $10 million, which they funneled as bribes for their personal use.  These funds should have been used either by FIFA for the benefit of its member associations or the 2010 FIFA World Cup™ local organizing committee, or as originally intended to benefit the Caribbean region.  Investigation continues and further information will be provided to the court at the time restitution is considered.

Additional sums that were diverted as bribes and kickbacks for media rights were made possible because of the value of the FIFA World Cup™.  For example, the reason Defendants Warner, Webb, Li, Rocha, Hawit, Callejas, Jiménez, Salguero, and Alvarado were able to extract millions of dollars in bribes for FIFA World Cup™ qualifiers was because of the decades and

---

[6]   These figures are subject to further investigation and may be supplemented.

billions of dollars that FIFA has spent building the FIFA World Cup™ into the world's biggest single-sport event and one of the most watched sporting events. Likewise, the only reason the world's top players could participate in confederation cups like the Copa América and the Gold Cup was because FIFA put them on its official calendar and thus required those players' club teams to permit them to participate on behalf of the national teams competing in the tournaments. Without FIFA's approbation, these tournaments never could have generated the same level of excitement and enthusiasm among fans, nor the sports marketing money that came with it. And the international friendly matches, conceived in corrupt negotiations and carried out on the back of bribe payments, traded on the brand and goodwill of international football's standard-bearer, FIFA, to generate revenues for the member associations. By corrupting these tournaments, matches, sponsorships, and other football affairs through their backroom deals and secret payoffs, the Defendants dragged FIFA into their sordid misconduct and tarnished the FIFA brand.[7] The amount of this graft should be returned to FIFA and its member associations to be distributed for the benefit of international football.

### D. The Defendants Caused FIFA to Incur Significant Attorney Fees and Business and Legal Costs.

In response to the Defendants' criminal conduct and the Government's prosecution of them, FIFA has had to incur substantial costs to investigate the Defendants' misconduct and assist in the investigation and prosecution of the Defendants around the world, including in the United States and Switzerland. FIFA is entitled to restitution for its attorney fees and business and legal costs that directly flowed from the indictments and ongoing investigations. These

---

[7]   As noted above, the confederations are separate and independent from FIFA. FIFA was not involved in the sale of media rights for the confederations' tournaments and matches, and FIFA is not responsible for the criminal conduct of these officials and marketing executives. Nonetheless, as shown, their wrongful actions gravely damaged FIFA's brand and reputation.

include amounts incurred as a result of FIFA's ongoing cooperation in the Swiss and U.S. investigations (in compliance with Swiss law), and its work to revitalize business relationships and remedy the reputational harm caused by defendants. *See, e.g.*, *United States v. Amato*, 540 F.3d 153, 159–60 (2d Cir. 2008) (under Section 3663A(b)(4), "'other expenses' incurred during the victim's participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense may include attorney fees and accounting costs"). The damages are ongoing. Calculation of these fees and costs will be made and submitted for consideration by the court in its order of restitution.

WHEREFORE, as a victim of the Defendants' criminal conduct, FIFA respectfully requests that it be awarded restitution in the full amount of its damages. Some of these damages are ongoing. The exact amount of these damages are subject to further investigation, but will be submitted to the court for an order of restitution submitted at sentencing. Restitution is appropriate and should be ordered for the:

(a)   Reputational harm the Defendants have caused to FIFA;

(b)   Salaries, bonuses, benefits, and other compensation FIFA paid to the Defendants in the amount of $28,224,687;

(c)   Theft of $10,000,000.00 by Defendants Jack Warner, Charles Blazer, and their co-conspirators;

(d)   Other sums that were diverted as bribes and kickbacks for media rights, which were made possible because of the value of the FIFA brand; and

(e)   FIFA's costs, including attorney fees, incurred during its participation in the investigation and prosecution of the Defendants' crimes.

Dated:   Washington, D.C.            QUINN EMANUEL URQUHART
         March 15, 2016             & SULLIVAN, LLP


                                    /s/ William A. Burck
                                    William A. Burck
                                    Jenny A. Durkan
                                    Thomas Werlen
                                    Stephen M. Hauss
                                    777 6th Street, NW, 11th Floor
                                    Washington, D.C. 20001
                                    Telephone: (202) 538–8000
                                    Facsimile: (202) 538–8100
                                    williamburck@quinnemanuel.com
                                    jennydurkan@quinnemanuel.com
                                    thomaswerlen@quinnemanuel.com
                                    stephenhauss@quinnemanuel.com

                                    *Attorneys for Fédération Internationale de Football Association*